THE PRESTWICK GROUP, INC.                  Case No.: 2:14-cv-00731-JPS

              Plaintiff,

    v.

LANDMARK STUDIO, LTD,

              Defendant.

    and

ERIE INSURANCE EXCHANGE,

              Intervenor.

## BRIEF OF LANDMARK STUDIO, LTD. IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

Defendant Landmark Studio, Ltd. ("Landmark"), pursuant to Fed. R. Civ. P. 56 and Civ. L.R. 7, moves the Court for an order dismissing all claims against it because there is no genuine dispute as to any material fact and Landmark is entitled to judgment as a matter of law. The trade dress and unfair competition claims brought by The Prestwick Group, Inc. ("Prestwick") fail due to lack of compliance with the doctrine of laches, and alternatively there is no evidence that they are entitled to the protection afforded by federal trade dress. Prestwick also fails to make a valid claim for unfair competition. Finally, it is not afforded the copyright protections it claims in the complaint.

## INTRODUCTION AND BACKGROUND

The Prestwick Group, Inc. ("Prestwick") filed this lawsuit on June 24, 2014, alleging trade dress infringement, unfair competition, and copyright infringement against Landmark

1

Studio, Ltd. ("Landmark"). (*See generally* Complaint). Prestwick asserts it has a valid trade dress in products it has manufactured in its "high-end recycling and trash container receptacles and indoor-outdoor furnishings" that are "popular with golf courses, hotels, resorts, and colleges and universities" in all 50 states and throughout 55 countries. (Complaint, ¶ 7).

Prestwick alleges that despite the variety of its products, a "significant subset" are inherently distinctive and have acquired secondary meaning in the marketplace because they include combinations of: post-and-panel construction, contrasting colors, substantially square posts in the cross sections, decorative arches in frame elements between posts, and decorative vertical grooves on the panels. (Complaint, ¶¶ 8-9).

Without a definitive timeline, the complaint alleges that Landmark's products are confusingly similar to Prestwick's trade dress. (Complaint, ¶ 32). Prestwick also alleges that retailers and consumers could likely be confused by products of both companies existing in the marketplace and it has no remedy other than an injunction against Landmark. (Complaint, ¶¶ 33, 36).

Additionally, the complaint alleges that Prestwick created an original work of authorship that resulted in the manufacture of a product for Loyola Marymount University ("LMU") that it "secured the exclusive rights and privileges in and to the statutory copyright" by filing its designs with the United States Copyright Office on June 17, 2014. (Complaint, ¶¶ 38-40). It also alleges that Landmark deliberately and willfully infringed that copyright because there was actual notice and knowledge of the copyright when Landmark developed a product for LMU which are alleged to be derivative works based on the Prestwick copyright. (Complaint, ¶¶ 41-44).

## FACTS

1.      According to Matt Morse, President and CEO of Prestwick, Prestwick (then known as Great Lakes) first encountered Landmark in early 1999 when Mark Hammer found Landmark to mold log tee markers for Prestwick.  The relationship continued until April or May of 2002.  Defendant's Proposed Finding of Fact No. 1 ("DPFF") (for ease of reference, the term "Prestwick" will be used for all of the former entities as well as the current Prestwick Group entities collectively, Prestwick Golf Group, Prestwick Limited, Max-R and Nexterra.  Specific entities will be referenced as necessary.  *See* DPFF 1).

2.      In addition to log tee markers, Landmark also made signs, internal rings for round waste enclosures and lids for enclosures for Prestwick.  DPFF 2.

3.      Prestwick used Landmark because it did not want to invest in its own CNC machine.  Prestwick was focused on sales and marketing and used outside contractors for manufacturing.  DPFF 3.

4.      Morse testified that the relationship with Landmark ended when a Prestwick salesman got a call from a company that had problems with tee markers and wanted replacements.  Prestwick determined that the company was mistaken and had in fact purchased the tee markers from Landmark.  DPFF 4.

5.      Morse contacted Dan Hlava at Prestwick and informed him that Landmark could be a competitor or a vendor, but not both.  Dan decided to be a competitor.  Prestwick was not happy with the decision, but did not have any choice but to part ways with Landmark.  DPFF 5.

6.      When the relationship ended there was a dispute over plastic material and money owed by Prestwick to Landmark.  Prestwick later paid the money because Morse felt it was the

3

right thing to do. He didn't agree with Dan's decision to become a competitor at the time and doesn't agree with what Landmark is doing now DPFF 6.

7.      Prestwick purchased its own CNC machine in January of 2002. The machine replaced Prestwick's outside vendors used for CNC work, including Landmark, and brought manufacturing in-house at Prestwick. DPFF 7.

8.      Morse was not happy that Landmark sold the tee markers to other customers. He did not expect his contractors to compete with him, but others have done it as well. DPFF 8.

9.      Morse testified that Prestwick entity Max-R has had multiple competitors copy their business model, develop similar brands and steal Max-Rs designs. DPFF 9..

10.      For example, Morse is aware of ten different companies that have stolen their rope stake design, but has done nothing and plans to do nothing. Similarly, Prestwick has done nothing in response to Rarite and Midpoint stealing their designs. DPFF 10.

11.      Eric Tallmadge worked in sales for Prestwick until mid-2002. DPFF 11.

12.      After Tallmadge left, Morse learned he had joined Dan at Landmark. DPFF 12.

13.      When Tallmadge joined Landmark, Morse felt the knocking off of Prestwick's products really accelerated. DPFF 13.

14.      Prestwick (then known as Great Lakes) retained counsel to address the actions of Landmark and Eric Tallmadge. DPFF 14.

15.      On July 23, 2002, Prestwick's counsel sent a detailed letter to Landmark's counsel setting forth a host of allegations relating to improper conduct by Landmark and Eric Tallmadge. DPFF 15.

16.      The allegations of improper conduct are virtually identical to the claims in this lawsuit. Prestwick's counsel alleged in 2002 that Landmark had engaged in a series of deceitful

4

and unlawful acts, entered into an unlawful combination with a former employee, and have engaged in unfair competition with Prestwick. Id. The alleged illegal acts included infringement of trade dress, false and misleading designation of origin, misleading advertising, interference with contract, civil conspiracy, conversion and unlawful misappropriation of trade secrets. DPFF 16.

17.     A second letter send by Prestwick's counsel on August 14, 2002, notes that no response has been received and that Prestwick will file suit in the near future. DPFF 17.

18.     Morse decided not to pursue Tallmadge or Landmark in 2002. DPFF 18.

19.     Morse testified as to his knowledge of a long history of Landmark copying Prestwick's designs. DPFF 19.

20.     Starting in 2002 when they stopped being a contractor for Prestwick, Landmark offered their own line of similar round enclosures and may have copied the Prestwick design for the internal ring. Shortly thereafter, Morse saw Landmark use Post and Panel design, similar panel designs, same posts designs, etc. DPFF 20.

21.     Morse also testified that Landmark copied early numbering systems for their products from the Prestwick catalogs. DPFF 21.

22.     Morse noted that other competitors, Par-Aide and Standard have also copied the Prestwick log tee marker design. DPFF 22.

23.     Prestwick has done nothing about Par-Aide and Standard's copying; they decided to pick and choose their battles. DPFF 23.

24.     Morse contends there is a long list of companies that manufacture Post and Panel products that infringe on Prestwick's design. DPFF 24.

25.     Morse contends that copying is a common practice in these markets, and that Prestwick's products are being knocked off left and right.  DPFF 25.

26.     By filing this lawsuit, Prestwick finally decided to do something about the copying of its products.  DPFF 26.

27.     Morse saw the Landmark 2003 product catalog in 2003 and concluded that Landmark was copying Prestwick products and item numbers.  DPFF 27.

28.     Despite being aware from 2003 to 2010 that Landmark was selling direct copies, Prestwick took no action.  DPFF 28.

29.     Morse contends that all Landmark products with Post and Panel construction are infringing, and that Prestwick learned in 2003 that Landmark was selling products that infringed upon the Prestwick trade dress elements, specifically the Post and Panel construction, substantially square posts and decorative vertical groove elements.   Morse contends this infringement has continued to the present day.  DPFF 29.

30.     Morse believes that Landmark's infringement of Prestwick's use of contrasting colors and decorative arches begin around 2008.  DPFF 30.

31.     Morse acknowledged that he should have done something to address Landmark's copying a long time ago, but he was short sighted and naïve.  DPFF 31.

32.     Morse contends that several other competitors have also blatantly copied the Prestwick trade dress, and have been doing so for some time.  DPFF 32.

33.     Prestwick contends that Landmark has copied its business model with a pattern of conduct of over 15-17 years.  DPFF 33.

34.     Morse indicated that Landmark's use of an arch in its products is a good example of copying from Prestwick, but acknowledged that Landmark's arch is not identical and is manufactured differently than Prestwick's arch.  DPFF 34.

35.     Mark Hammer of Prestwick testified that he first became aware of Landmark selling a Prestwick product in 2002 or 2003, the log tee marker.  DPFF 35.

36.     Hammer testified that from 2003 or 2004 on, Landmark was contacting Prestwick customers and constantly selling products similar to Prestwick, causing customer confusion. DPFF36.

37.      Hammer contends the Prestwick products are unique because of Post and Panel construction, contrasting colors, panel designs, arch designs and the overall look and feel.  DPFF 37.

38.     Hammer believes that Prestwick was the first to offer Post and Panel construction, but at least four competitors started to offer the same construction within 3-4 years after 1999. DPFF 38.

39.     Hammer testified that everybody at Prestwick was aware that Landmark was selling similar products, but Prestwick did nothing until 2014.  DPFF 39.

40.     Hammer learned of customer confusion between Landmark and Prestwick back in 2003 or 2004, and 2004-2005.  DPFF 40.

41.     Morse contends that Prestwick's use of the trade dress elements at issue in this lawsuit are unique because he believes the specific elements were not offered in such products for the golf market or other specific markets before Prestwick.  For example, other products offer contrasting colors, but Prestwick claims their use is unique because they believe they were the first to offer contrasting colors to the golf market.  DPFF 41.

7

42.     Prestwick contends it is the only entity with the right to sell products with these elements in the golf market or the other specific markets they compete in.  DPFF 42.

43.     Morse denies that Post and Panel construction is functional, since there are other methods to achieve the same function of attaching a panel and a post or board.  DPFF 43.

44.     Hammer initially denied that Post and Panel construction is functional, but eventually conceded that it serves the function of connecting panels and boards.  DPFF 44.

45.     Hammer contends that Prestwick's panel designs are unique because of vertical grooves, the outline and the overall design, but acknowledged that other competitors have been selling similar panel designs starting 3-4 years after Prestwick.  DPFF 45.

46.     Matt Frick joined Prestwick (then Great Lakes) in 1997, working in product manufacturing.  DPFF 46.

47.     Frick has woodworking and plastic manufacturing experience, including an understanding of joinery methods like dado joinery and other methods.  Post and Panel construction is another name for dado joinery.  Dado joinery uses a slot in a post to slide a panel into to join together.  Other companies use dado joinery, as in woodworking.  The purpose is to attach a panel and post together.  DPFF 47.

48.     From time to time, Prestwick employees have received requests from customers to make products similar to those offered by their competitors.  DPFF 48.

49.     When a customer asks for a product similar to a competitor's design, Prestwick re-engineers the product and makes it their own through the use of Prestwick's building methods and panel designs.  DPFF 49.

50.     Dan Hlava is one of the principals of Landmark.  DPFF 50.

51.     Hlava has extensive training and experience in pattern and model making, molding and building techniques for cabinets and other wood furniture.  DPFF 51.

52.     Hlava is familiar with Roman building techniques for arches and keystones.  DPFF 52.

53.     Hlava testified that Landmark's construction techniques are not trade secrets and have been done for hundreds of years.  DPFF 53.

54.     In 1996, Landmark was focusing on point of purchase sales and decided to venture into the golf market.  DPFF 54.

55.     In 1996 or 1997, Landmark made its first sale to the golf market, selling pine-cone shaped tee markers to the newly-opened Bristlecone Pines Golf Course.  DPFF 55.

56.     Landmark also offered tee signs, markers and directional signage to golf courses at that time.  DPFF 56.

57.     After the above sale, Bob Gerlach of Great Lakes (Prestwick) approached Landmark and wanted Landmark to manufacture for Great Lakes, since Great Lakes already had a golf sales team.  DPFF 57.

58.     Landmark started manufacturing a log tee marker for Prestwick.  DPFF 58.

59.     Landmark cut down a log and used an actual piece of wood to create the mold for the log tee markers it manufactured for Prestwick.  Landmark did not use an existing Prestwick product for the mold.  DPFF 59.

60.     Landmark makes waste and recycling enclosures that use a full-frame method of construction, which is distinct from post and panel construction.  DPFF 60.

9

61. Landmark's goal was to be responsive to customer needs and design products based on customer requests. Landmark was not trying to be the same or different than Prestwick or anyone else. DPFF 61.

62. Landmark was the first to offer products with a Brazilian hardwood called Ipe. DPFF 62.

63. Landmark brought Ipe to the golf market to distinguish from companies making products out of plastic. DPFF 63.

64. Landmark was first to sell products with Ipe to the golf market. DPFF 64.

65. Eric Tallmadge did not bring any materials or customer lists to Landmark from Prestwick. Landmark purchased a full database of golf course contacts and used the database for potential marketing. Hlava had a stack of Prestwick invoices and destroyed them, not wanting to be accused of using Prestwick information to start his company. DPFF 65.

66. Landmark's goal is not to copy Prestwick's products, but to offer square enclosures with their own construction methods and knowledge, specifically full-frame construction. DPFF 66.

67. Landmark has refused to copy Prestwick products when requested, including a customer request to put a Prestwick keystone design element on a Landmark Product. DPFF 67.

68. If a customer asks Landmark to match an existing product from a competitor, Landmark tries to sell them a similar but different existing product, they don't copy or reverse-engineer competitor products. DPFF 68.

69. In the case of LMU, Landmark had an existing product that was similar to what LMU wanted except for a few changes such as the logo. DPFF 69.

70. John Patla is a co-owner of Landmark with Dan Hlava. DPFF 70.

10

71.     Patla is a natural artist and sculptor who has built many things including sculptures, oil painting, airbrush work, furniture and cabinets.  Most of his work has been in cabinetry.  DPFF 71.

72.     Patla previously owned a company that made cabinets, shelves and candle holders.  DPFF 72.

73.     Patla previously worked for So-Lite signs and Pablocki, designing signs.  Patla learned post and panel construction in the sign industry, where it is very common. DPFF 73.

74.     In 1994, Patla incorporated Landmark Studio and made signs and props for trade shows and museums, and airbrush work.  DPFF 74.

75.     Also in 1994, Patla began work on the design of a plastic sign for golf courses. DPFF 75.

76.     Patla met Hlava due to the close proximity of their businesses.  Hlava saw his golf course sign and was working on golf course products and they felt they could help each other out with their businesses.  DPFF 76.

77.     They joined together to form Landmark Studio, LTD, to go after point of purchase sales, store fixturing, museums and the golf course market.  DPFF 77.

78.     Patla is responsible for around 80 percent of the original designs created by Landmark, with Hlava responsible for the remainder.  DPFF 78.

79.     Patla designed the water cooler enclosure in the Landmark 2004 recycled products catalog.  DPFF 79.

80.     Patla's design process for the water cooler started with the size of the trash container, and then he build around it based on function.  Holes were needed for the water cooler and cups, flaps for trash and recycling, and a roof to cover it.  DPFF 80.

81.     Landmark's products do not use post and panel construction, which consists of two posts with a panel inside.  DPFF 81.

82.     Landmark's products use full-frame construction, which is a frame all around with a panel inside.  Landmark uses full-frame because it is a common form of construction, does not require many tools, and is strong.  DPFF 82.

83.     The grooves and vertical lines on the water cooler are for aesthetics, to look like lumber. Landmark probably built the product out of wood before constructing it in plastic.  DPFF 83.

84.     The use of the color green in the water cooler was determined by the limited colors of recycled plastic available at the time.  Green blended in to the background of a golf course as opposed to a bright orange water cooler.  DPFF 84.

85.     Patla noted the Landmark water cooler was not similar to a water cooler designed by Prestwick, as the Landmark unit used full-frame construction, had 3 holes in front, a different roof pitch and a routed design.  Patla was not trying to make it look similar or different from Prestwick's products, was trying to make something functional to serve the need to lift the cooler off the ground.  DPFF 85.

86.     Patla was inspired by Victorian architecture and style and employed such designs in his home and then carried them to work; he believes he added an arch in 2002 or 2003.  DPFF 86.

87.     Tallmadge did not tell anyone at Landmark's vendors or assist with finding new vendors for Landmark.  DPFF 87.

88.      Tallmadge did not tell Landmark about Prestwick's building techniques.  DPFF 88.

12

89.     If a customer asked Landmark for a product similar to what they had previously purchased from a competitor, Landmark would attempt to offer something similar using Landmark's current construction.  Landmark is willing to use customer colors and logos and follow customer direction as to design, but does not work off of photos of competitor's products.  DPFF 89.

90.     Landmark attempts to be distinct, but not in reference to a competitor or specific product.  They try to make their own products based on quality of construction and service.  DPFF 90.

91.     Landmark and their competitors build cabinets to enclose trash containers.  DPFF 91.

92.     All cabinets from all sources have a number of similarities, including arches, shelves, tops, very little is distinct.  DPFF 92.

93.     Prestwick cabinets look like cabinets, as do Landmark cabinets.  DPFF 93..

94.     The design of the arch used in Landmark's products was determined by the size of the dado blade.  A larger blade is required for a more dramatic arch angle, but Landmark is not aware of a tool that would allow that safely.  DPFF 94.

95.     Patla created the first Landmark rendering for Loyola Marymount University (LMU).  DPFF 95.

96.     Patla was not aware that LMU had purchased products from Prestwick when he created the rendering.  DPFF 96.

97.     A Landmark sales representative relayed information from LMU to Patla via telephone about changes to an existing Landmark product that was similar to what LMU wanted.  DPFF 97.

13

98.     Patla understood that LMU wanted an existing unit called the 'Lamboo', flipped around, with openings on the short side, the LMU log, various recycling holes and colors and and to fit specific liner sizes.  DPFF 98.

99.     Patla was later informed that LMU wanted something to fit in with their existing units on campus, but he did not know that at the time he created the rendering.  Landmark already had something very similar and so it was adapted a little bit.  DPFF 99.

100.    Patla designed and built the Lamboo unit several months before the contact with LMU, which was similar in design the Landmark Luxury line, but without a logo board.  DPFF 100.

101.    Prestwick has offered testimony regarding alleged trade dress infringement from two witnesses that joined the company after 2007.  DPFF 101.

102.    Michael Marich started with the company in 2007 and offered testimony about his being told about alleged copying by Landmark.  Jason Heard started with the company in 2009 and provided testimony about confronting Landmark as the competition and explaining his "knowledge" of alleged copying, despite being told the story by other Prestwick employees.  DPFF 102.

## MEMORANDUM OF LAW

### I.     LANDMARK IS PROTECTED BY THE DOCTRINE OF LACHES.

Landmark is protected from Prestwick's allegations of trade dress and unfair competition through the doctrine of laches.  Discovery shows Prestwick believes Landmark infringed on its trade dress and competition in similar marketplaces as early as 2002 and possibly as early as 1999.  Despite its claims that it knew about this alleged infringement and competition, Prestwick

14

failed to act for almost 13 years and now puts Landmark in a position of having to protect its business, products, and designs that have been in the market for more than a decade.

"Laches is principally a question of the inequity of permitting a claim to be enforced. . . . In order to support a defense of laches, there must be a showing of both a lack of diligence by the party against whom the defense is asserted and prejudice to the defending party." *Lingenfelter v. Keystone Consl. Indus., Inc.*, 691 F.2d 339, 340 (7th Cir. 1982) (per curiam) (citing *Costello v. United States*, 365 U.S. 265, 282, 81 S. Ct. 534 (1961), other citations omitted). Under the two-prong test for laches, "the plaintiff bears the burden of explaining its delay in bringing suit." *Id.* (citations omitted). If the delay in bringing suit is inexcusable, the defendant must show prejudice; however, there is a presumption the defendant suffers damage and prejudice as a result. *Id.* (citing *Baker Manf. Co. v. Whitewater Manf. Co.*, 430 F.2d 10008, 1011-15 (7th Cir. 1970)).

### A. Prestwick Has Provided No Reason or Excuse for Its Delay in Bringing Suit.

Prestwick has known of the alleged copying of its designs by Landmark for more than a decade, but waited 12 years to do anything about it.

Matt Morse of Prestwick testified as to his knowledge of a long history of Landmark copying Prestwick's designs. DPFF 19. Starting in 2002 when they stopped being a contractor for Prestwick, Landmark offered their own line of similar round enclosures and may have copied the Prestwick design for the internal ring. Shortly thereafter, Morse saw Landmark use Post and Panel design, similar panel designs, and same posts designs. DPFF 20. Morse also testified that Landmark copied early numbering systems for their products from the Prestwick catalogs. DPFF 21.

15

Morse noted that other competitors, Par-Aide and Standard have also copied the Prestwick log tee marker design. DPFF 22. Prestwick has done nothing about Par-Aide and Standard's copying; they decided to pick and choose their battles. DPFF 23. Morse contends there is a long list of companies that manufacture Post and Panel products that infringe on Prestwick's design. DPFF 24. Morse contends that copying is a common practice in these markets, and that Prestwick's products are being knocked off left and right. DPFF 25.

Despite being aware from 2003 to 2010 that Landmark was selling direct copies, Prestwick took no action. DPFF 28. By filing this lawsuit, Prestwick finally decided to do something about the copying of its products. DPFF 26.

Morse contends that all Landmark products with Post and Panel construction are infringing, and that Prestwick learned in 2003 that Landmark was selling products that infringed upon the Prestwick trade dress elements, specifically the Post and Panel construction, substantially square posts and decorative vertical groove elements. Morse contends this infringement has continued to the present day. DPFF 29. Morse believes that Landmark's infringement of Prestwick's use of contrasting colors and decorative arches begin around 2008. DPFF 30.

Morse acknowledged that he should have done something to address Landmark's copying a long time ago, but he was short sighted and naïve. DPFF 31. Prestwick contends that Landmark has copied its business model with a pattern of conduct of over 15-17 years. DPFF 33. Morse contends that several other competitors have also blatantly copied the Prestwick trade dress, and have been doing so for some time. DPFF 32.

Mark Hammer of Prestwick testified that he first became aware of Landmark selling a Prestwick product in 2002 or 2003, the log tee marker. DPFF 35. Hammer testified that from

2003 or 2004 on, Landmark was contacting Prestwick customers and constantly selling products similar to Prestwick, causing customer confusion. DPFF36. Hammer learned of customer confusion between Landmark and Prestwick back in 2003 or 2004, and 2004to 2005. DPFF 40.

Hammer testified that everybody at Prestwick was aware that Landmark was selling similar products, but Prestwick did nothing until 2014. DPFF 39.

The closest thing to a reason Prestwick provides for its more than decade long delay in bringing suit was succinctly provided by the company's President, Matt Morse. Morse acknowledged that he should have done something to address Landmark's copying a long time ago, but he was short sighted and naïve. DPFF 31.

In *Lingenfelter*, the plaintiff delayed in filing suit for at least six years and offered no excuse for the delay. *Lingenfelter*, 691 F.2d at 341. The district court found and the Seventh Circuit upheld that an "unexplained delay of nine years between the accrual of the cause of action and filing suit satisfied the first prong of the laches defense." *Id.*

Here, Prestwick has failed to bring a suit more than a decade after it testified it believed that Landmark began to infringe on its trade dress.

Prestwick cannot credibly claim that it was unaware that it could take legal action to protect against Landmark's actions. When Tallmadge joined Landmark, Morse felt the knocking off of Prestwick's products really accelerated. DPFF 13. Prestwick (then known as Great Lakes) retained counsel to address the actions of Landmark and Eric Tallmadge. DPFF 14.

On July 23, 2002, Prestwick's counsel sent a detailed letter to Landmark's counsel setting forth a host of allegations relating to improper conduct by Landmark and Eric Tallmadge. DPFF 15. The allegations of improper conduct are virtually identical to the claims in this lawsuit.

17

Prestwick's counsel alleged in 2002 that Landmark had engaged in a series of deceitful and unlawful acts, entered into an unlawful combination with a former employee, and have engaged in unfair competition with Prestwick. Id. The alleged illegal acts included infringement of trade dress, false and misleading designation of origin, misleading advertising, interference with contract, civil conspiracy, conversion and unlawful misappropriation of trade secrets. DPFF 16.

A second letter sent by Prestwick's counsel on August 14, 2002, notes that no response has been received and that Prestwick will file suit in the near future. DPFF 17. Morse decided not to pursue Tallmadge or Landmark in 2002. DPFF 18.

There is no excuse for Prestwick's delay of more than a decade. The first prong of the doctrine of laches is satisfied.

### B. Landmark is Unduly Prejudiced and Has Suffered Damage from the Delay.

As a result of Prestwick's conscious decision to spend more than 12 years competing in the marketplace with Landmark and numerous other companies it feels continually infringe on its trade dress, Landmark is unduly prejudiced by Prestwick's filing of this suit.

In the decade or more since Prestwick's allegations first accrued, Landmark has expanded its product lines, spent significant amounts of money on product advertising and company growth, and dedicated itself to becoming a forerunner in the recycled plastic furnishings market. In over a decade, there has been no indication that Prestwick felt that Landmark was anything other than a competitor. *See generally*, DPFF 22-40 and 60-65.

Landmark's entire business model over a long history is being dragged into a dispute that stems from a much more recent event involving LMU. *See* Complaint, ¶¶ 38-44. It is beyond dispute that the passage of so much time has resulted in the loss of records and the loss of

memory of witnesses. The testimony from the witnesses from both parties is replete with contradictions and an absence of memory of critical events.

For example, the parties cannot agree about the end of their relationship. Prestwick contends that it ended the relationship when it determined that Landmark was competing with them for the same customers. DPFF 4-5. Landmark's testimony focuses on the purchase of a CNC machine by Prestwick that essentially eliminated the vendor relationship.

Landmark has spent time and money to defend itself in this litigation. Testimony from the witnesses of both parties show that so much time has passed that neither can agree on any type of framework for how business ventures and entry to the marketplace occurred.

Where there is "loss of important testimony and . . . monetary damages," that is more than enough to support a finding of prejudice and apply the doctrine of laches to bar a plaintiff's claim. *See Lingenfelter*, 691 F.2d at 342. Here, Prestwick has not only confused the testimony of the companies' relationship, it also offers testimony regarding the history of alleged trade dress infringement from two witnesses that joined the company after 2007. DPFF 101.

Michael Marich started with the company in 2007 and offered testimony about his being told about alleged copying by Landmark. Jason Heard started with the company in 2009 and provided testimony about confronting Landmark as the competition and explaining his "knowledge" of alleged copying, despite being told the story by other Prestwick employees. DPFF 102.

Landmark is obviously prejudiced by the time that has passed since Prestwick's acknowledgment of its belief of infringement in 2002. DPFF 14. Additionally, it is put at a disadvantage as differences in testimony come from newly hired employees that have freely offered information about the entire history of the relationship between Prestwick and Landmark

despite having been there for less than a decade. Finally, Landmark is prejudiced by the mounting costs it related to the defense of this litigation and its name in the market after fifteen years after Prestwick admits it initially believed its trade dress infringed. As a result, the doctrine of laches should be enforced to bar Prestwick's claims. Landmark's prejudice from Prestwick's delays satisfies the second prong of the doctrine of laches and the trade dress and unfair competition claims should be dismissed.

## II. LANDMARK DID NOT INFRINGE ON PRESTWICK'S CLAIMED TRADE DRESS.

Prestwick is not entitled to trade dress protection because its products are not inherently distinctive in the marketplace, they have not acquired secondary meaning with consumers, and are purely functional. To establish a cause of action, Prestwick must show: "(1) that the trade dress in question is protectable and, (2) that there is a likelihood of confusion with respect to the origin of the answering party's product." *See Foamation, Inc. v. Wedeward Enters., Inc.*, 970 F. Supp. 676, 685 (E.D. Wis. 1997) (citations omitted). To obtain protection for trade dress, Prestwick must show its claimed trade dress identifies and distinguishes its products as the source of the goods. *Id.* Functional design shapes which lack patent protection that exist in the public domain are "*fair game for imitation and copying*." *Keene Corp. v. Paraflex Indus., Inc.*, 653 F.2d 822 (3rd Cir. 1981) (emphasis added). Trade dress will be deemed functional if it is essential to the use or purpose of the product and affects the cost or quality of it. *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S.23, 33 (2001).

### a. Prestwick's Products are Functional.

To obtain trade dress protection, a plaintiff needs to prove that their product is non-functional. *See* 15 U.S.C. § 1125(a)(3); *see also*, *TrafFix*, 532 U.S.at 29 (2001). There are two tests to determine functionality. First, the Traditional Test that indicates something is functional

20

if "it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Id.* at 32. Second, if something does not pass the Traditional Test, it should be reviewed under the Competitive Necessity Test which looks to a functional feature as "one the exclusive use of which would put competitors at a significant non-reputation-related disadvantage." *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 165 (1995).

Here, the products at issue are inherently functional under the Traditional Test. They are enclosures for bins that hold refuse, recycling, or other things such as racks for towels or holders for coolers. Testimony shows that there are limited numbers of designs that permit the construction of these enclosures due to financial and/or space constraints.

Landmark and their competitors build cabinets to enclose trash containers. DPFF 91. That is the function they serve. All cabinets from all sources have a number of similarities, including arches, shelves, tops, very little is distinct. DPFF 92. Prestwick cabinets look like cabinets, as do Landmark cabinets. DPFF 93.

Landmark's construction techniques are not trade secrets and have been done for hundreds of years. DPFF 53. Post and Panel construction, as employed by Prestwick, is another name for dado joinery. Dado joinery uses a slot in a post to slide a panel into to join together. Other companies use dado joinery, as in woodworking. The purpose is to attach a panel and post together. DPFF 47.

As the old adage goes, form follows function. For example, Patla's design process for the water cooler started with the size of the trash container, and then he built around it based on function. Holes were needed for the water cooler and cups, flaps for trash and recycling, and a roof to cover it. DPFF 80.

21

Patla was inspired by Victorian architecture and style and employed such designs in his home and then carried them to work; he believes he added an arch in 2002 or 2003. DPFF 86. The design of the arch used in Landmark's products was determined by the size of the dado blade. A larger blade is required for a more dramatic arch angle, but Landmark is not aware of a tool that would allow that safely. DPFF 94.

*TrafFix* indicates that there is a desire to have functional characteristics and improvements available to all competitors in the market and any exception to the lack of protection for functionality must be obtained through the rights obtained in a patent. *See generally*, *TrafFix*, 532 U.S. 23.

The grooves and vertical lines on the water cooler are for aesthetics, to look like lumber. Landmark probably built the product out of wood before constructing it in plastic. DPFF 83.

The use of the color green in the water cooler was determined by the limited colors of recycled plastic available at the time. Green blended in to the background of a golf course as opposed to a bright orange water cooler. DPFF 84.

Prestwick's products are also functional under the Competitive Necessity Test. Testimony shows that Landmark builds custom products to the specifications of its customers and uses full-frame construction.

Landmark makes waste and recycling enclosures that use a full-frame method of construction, which is distinct from post and panel construction. DPFF 60, 61. Landmark's goal was to be responsive to customer needs and design products based on customer requests. Landmark was not trying to be the same or different than Prestwick or anyone else. DPFF 61. Landmark's goal is not to copy Prestwick's products, but to offer square enclosures with their own construction methods and knowledge, specifically full-frame construction. DPFF 66.

Prestwick seeks to prevent Landmark from constructing cabinets out of full-frame construction. Landmark's products use full-frame construction, which is a frame all around with a panel inside. Landmark uses full-frame because it is a common form of construction, does not require many tools, and is strong. DPFF 82. Landmark would be at a competitive disadvantage if it were forced to abandon this common construction technique and forced to employ some other, less common, less-strong method that required more tools and thus results in higher costs.

While two tone colors may not be considered functional, trade dress looks to the *overall* image or appearance of the product. Functionality can be combined with certain trade dress aspects, but the overall functionality of these boxes is what prevents Prestwick's claims from sticking.

Inspired by Victorian architecture, the design of the arch used in Landmark's products was determined by the size of the dado blade, as noted above.

Setting bins side by side is a functional necessity as well. Not many end users of a trash/recycling enclosure would be able to reach the third level of a vertical three tiered waste enclosure if standard interior receptacles were used.

Prestwick is trying to protect the appearance of what are essentially cabinets. It is also trying to protect itself from others using traditional cabinetry techniques to create shelving or holders for other equipment under the guise of post-and-panel construction, substantially square posts in the cross sections, decorative arches in frame elements between posts, and decorative vertical grooves on the panels.

23

Specifically pointing to the Competitive Necessity Test, these "decorative vertical grooves" are necessary to provide the effect of individual slats while using an entire panel which assists in keeping costs down.

### b. Prestwick's Products are Not Distinctive.

Prestwick's products are not distinctive. What they ask the Court to give protection to are essentially storage container shaped like cabinets. Landmark's products use full-frame construction, which is a frame all around with a panel inside. Landmark uses full-frame because it is a common form of construction, does not require many tools, and is strong. DPFF 82.

There is nothing inherently distinctive about similar enclosures, made to look like traditional cabinets that have been made by more than half a dozen companies for more than a decade.

Landmark and their competitors build cabinets to enclose trash containers. DPFF 91. All cabinets from all sources have a number of similarities, including arches, shelves, tops, very little is distinct. DPFF 92. Prestwick cabinets look like cabinets, as do Landmark cabinets. DPFF 93.

Morse contends that Prestwick's use of the trade dress elements at issue in this lawsuit are unique because he believes the specific elements were not offered in such products for the golf market or other specific markets before Prestwick. For example, other products offer contrasting colors, but Prestwick claims their use is unique because they believe they were the first to offer contrasting colors to the golf market. DPFF 41. Prestwick contends it is the only entity with the right to sell products with these elements in the golf market or the other specific markets they compete in. DPFF 42. Morse denies that Post and Panel construction is functional, since there are other methods to achieve the same function of attaching a panel and a post or

24

board.  DPFF 43.  Hammer initially denied that Post and Panel construction is functional, but eventually conceded that it serves the function of connecting panels and boards.  DPFF 44.

Hammer contends that Prestwick's panel designs are unique because of vertical grooves, the outline and the overall design, but acknowledged that other competitors have been selling similar panel designs starting 3-4 years after Prestwick.  DPFF 45.

A product's shape can never be inherently distinctive for purposes of trade dress protection.  *Foamation*, 970 F. Supp. at 686.  When talking about identical foam cheese wedges, this Court said, "Let's be blunt.  It is the configuration of the cheese wedge hat that makes it what it is.  In other words, the configuration is the very essence of the product."  *Id.*  Here to, the need to be blunt becomes clear—these are boxes made to look like they are made out of wood.  There are only certain numbers of ways to construct recycled plastic pieces to look like they were made with wood.  As a result, if the product "is to be afforded trade dress protection, such protection must arise because the . . . [product] has acquired secondary meaning."  *Id.*

The Supreme Court held, however, that while trade dress can be inherent or acquired; however, product configuration and single color trade dress is never "inherently distinctive" and requires secondary meaning to be registered.  *Wal-Mart Stores, Inc.*, 529 U.S. 205, 212-13 (2000).  Because of the availability of copyright protections, product designs must have acquired "secondary meaning" for trade dress protections to be enforced because there is the availability of copyright protection.  *See id.* at 214.

Seventh Circuit courts tend to use the *Seabrook* test to determine "inherent distinctiveness."  *See*, *e.g.*, *Turtle Wax, Inc. v. First Brands Corp*, 781 F. Supp. 1314, 1318 (N.D. Ill. 1991) (Rovner, J.). (citing *Seabrook Foods, Inc. v. Bar-Well Foods, Ltd.*, 568 F.2d 1342, 1344 (C.C.P.A. 1977).  The *Seabrook* test requires a determination of whether the plaintiff's

claimed trade dress is a "common" shape or design, whether it is unique or unusual in a particular field, or if it is just a refinement of commonly adopted and well known forms of ornamentation for a particular group of goods. *See id.*

As noted in the discussion of Laches above, Prestwick contends that a number of companies, including Landmark, have copied the elements of its trade dress that are unique and distinctive, and have done so for many years. As a result, none of the elements that make up the claimed trade dress can be distinctive or unique. Prestwick's trade dress, if it ever existed, has been hopelessly and completely diluted and extinguished by the presence of a multitude of similar products.

Prestwick's own testimony establishes the similarity between its designs and the designs of its competitors. Morse contends that all Landmark products with Post and Panel construction are infringing, and that Prestwick learned in 2003 that Landmark was selling products that infringed upon the Prestwick trade dress elements, specifically the Post and Panel construction, substantially square posts and decorative vertical groove elements. Morse contends this infringement has continued to the present day. DPFF 29. Morse believes that Landmark's infringement of Prestwick's use of contrasting colors and decorative arches begin around 2008. DPFF 30. Prestwick contends that several other competitors have also blatantly copied the Prestwick trade dress, and have been doing so for some time. DPFF 32.

### c. Prestwick Has Provided No Evidence of Secondary Meaning.

Prestwick is unable to provide any evidence that its products have obtained "secondary meaning" in the consuming public's mind. "Secondary meaning is acquired when in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself." *Foamation*, 970 F. Supp at 687 (internal citations and

26

quotations omitted). Even more importantly, consumers must care that a product comes from a particular producer and must desire the product with a particular feature because it signifies the producer. *See id.* It becomes the plaintiff's burden to establish the product design "is a mark of distinction identifying the source of the article and that purchasers are moved to buy it because of its source." *Id.* (citing *Blisscraft of Hollywood v. United Plastics Co.*, 294 F.2d 694, 697 (2nd Cir. 1961).

Secondary meaning can be established through: 1) direct consumer testimony, 2) consumer surveys, 3) length and manner of use, 4) amount and manner of advertising, 5) volume of sales, 6) place in the market, and 7) proof of intentional copying. *Spraying Systems Co. v. Delavan, Inc.*, 975 F.2d 387 (7th Cir. 1992). While no single factor is determinative, Prestwick has no evidence of any of the factors.

### d. Landmark's Products Are Distinct and Functional

Landmark's products do not use post and panel construction, which consists of two posts with a panel inside. DPFF 81. Landmark's products use full-frame construction, which is a frame all around with a panel inside. Landmark uses full-frame because it is a common form of construction, does not require many tools, and is strong. DPFF 82. As a result, Landmark has not infringed on Prestwick's claimed trade dress.

## III. PRESTWICK HAS FAILED TO PROPERLY ALLEGE A CLAIM FOR UNFAIR COMPETITION.

Prestwick has failed to properly allege a claim for unfair competition under federal or state law. Its complaint clearly only alleges trade dress infringement and copyright infringement. *See* Pl. Comp. If Prestwick is making a state law claim for unfair competition, there is no statute of limitations in Wis. Stat. § 100.20; however, Landmark asserts that a six year, general statute of limitations should apply under the apparently theory of "action for wrongful taking of

27

personal property" as proscribed in Wis. Stat. § 893.51(1). The Eastern District of New York applied the New York fraud statute of limitations to the Lanham Act where there was a claim for false designation of origin, but no clear statute of limitations. *See H&R Indus., Inc. v. Kirschner*, 899 F. Supp. 995, 1001 (E.D.N.Y. 1995).

The elements of unfair competition are: 1) appropriation of the plaintiff's product; 2) competition between the plaintiff and the defendant; and 3) misappropriation and exploitation of a competitor's business values. *See generally*, *International News Service v. Associated Press*, 248 U.S 215 (1918). A Wisconsin state case dealing with unfair competition stated, "[t]he legal principles which are controlling here are simply the principles of old-fashioned honesty. One man may not reap where another has sown nor gather where another has strewn." *Mercury Record Productions, Inc. v. Economic Consultants, Inc.*, 64 Wis. 2d 163, 176, 218 N.W.2d 705, 711 (1974) (internal citations and quotations omitted).

## IV. Landmark Did Not Violate Prestwick's Copyright in the LMU Product

Copyright protection extends to "original works of authorship" including "pictorial, graphic and sculptural works." 17 U.S.C. §§ 101, 102. Copyright protection does not apply to "useful" articles unless the design sought to be protected is conceptually separable from the product. *See Kieselstein Cord*, 632 F.2d 989, 993 (2d Cir. 1998).

As noted above, there is little design beyond the function of a cabinet to enclose a particular type of waste receptacle. Assuming the work is entitled to protection, Plaintiff needs to show copying through access to the copyrighted work and "substantial similarity" between it and the accused work.

28

The testimony of John Patla establishes that he independently created the product for LMU based on an existing Landmark product and customer input from LMU. It also establishes that the Landmark product was created without access to Prestwick's copyrighted work.

Patla created the first Landmark rendering for Loyola Marymount University (LMU). DPFF 95. Patla was not aware that LMU had purchased products from Prestwick when he created the rendering. DPFF 96. A Landmark sales representative relayed information from LMU to Patla via telephone about changes to an existing Landmark product that was similar to what LMU wanted. DPFF 97. Patla understood that LMU wanted an existing unit called the 'Lamboo', flipped around, with openings on the short side, the LMU log, various recycling holes and colors and and to fit specific liner sizes. DPFF 98.

Patla was later informed that LMU wanted something to fit in with their existing units on campus, but he did not know that at the time he created the rendering. Landmark already had something very similar and so it was adapted a little bit. DPFF 99. Patla designed and built the Lamboo unit several months before the contact with LMU, which was similar in design the Landmark Luxury line, but without a logo board. DPFF 100.

## CONCLUSION

Based on the foregoing, Landmark Studio, Ltd. respectfully requests its Motion for Summary Judgment be granted, dismissing the Plaintiff's claims in their entirety, with prejudice, on the merits, and with costs.

Dated this 27th day of March, 2015.

CRIVELLO CARLSON, S.C.
Attorneys for Defendant Landmark Studio, Ltd.

By: /s/Ryan G. Braithwaite
PATRICK W. BRENNAN
State Bar No. 1014688
RYAN G. BRAITHWAITE
State Bar No. 1037232
WILLIAM E. KEELER, III
State Bar No. 1059791

Post Office Address:
710 N. Plankinton Avenue
Milwaukee, WI 53203
Phone: 414-271-7722
Fax: 414-271-4438
pbrennan@crivellocarlson.com
rbraithwaite@crivellocarlson.com