UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

THE PRESTWICK GROUP, INC.                     Case No.: 2:14-cv-00731-JPS

      Plaintiff,

  v.

LANDMARK STUDIO, LTD,

      Defendant.

  and

ERIE INSURANCE EXCHANGE,

      Intervenor.

---

**LANDMARK STUDIO, LTD.'S REPLY IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

---

Defendant Landmark Studio, Ltd. ("Landmark"), pursuant to Fed. R. Civ. P. 56 and Civ. L.R. 7, submits the following Reply in Support of its Motion for Summary Judgment.

## SUMMARY JUDGMENT STANDARD

Landmark takes no issue with The Prestwick Group's ("Prestwick") description of the standard of review, but asserts the facts and reasonable inferences construed in the light most favorable to the plaintiff, could permit no reasonable jury to return a verdict for the plaintiffs. *See CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014).

## ARGUMENT

**I.    THE APPROPRIATE STATUTE OF LIMITATIONS IS THREE YEARS.**

Prestwick mischaracterizes Landmark's response to the unfair competition claim to attribute a six-year statute of limitations. Pl. Br. in Opp. at 12. Because the Lanham Act does

1

not contain a statute of limitations, the Seventh Circuit looks to "analogous state statutes of limitations" in order to determine what should apply. *Chattanooga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 793 (7th Cir. 2002).

The three-year statute of limitations found in the Uniform Trade Secrets Act, Wis. Stat. § 893.51(2), is the analogous statute. Section 134.90 describes similar terms included in Prestwick's allegations and permits injunctive relief. Prestwick alleges that Landmark has hired its former employees and copied its designs/products for years, Pl. Br. in Opp. at 1-8. Section 134.90 describes misappropriating another's information through "improper means," using it "without express or implied consent…" § 134.90(1)-(2). Based on the similarities of the allegations, the Court should adopt a three-year statute of limitations. Even if the Court does not accept the three year limit, federal law institutes a four year general limitation on the commencement of civil actions. 28 U.S.C. § 1658.

## II. PRESTWICK HAS NOT SHOWN PROGRESSIVE ENCROACHMENT

The doctrine of laches applies to Prestwick's suit against Landmark because case law related to progressive encroachment is distinguishable. Landmark continues to suffer prejudice as a result of Prestwick's lengthy and unreasonable delay in filing suit. They have been competitors since 2002 and both have expanded their presence in various marketplaces since without any action by Prestwick or any material alteration in Landmark's conduct.

Summary judgment was granted to a plaintiff following a defendant's 14-year delay in asserting a claim because that the delay was not excused by the doctrine of progressive encroachment. *Wisconsin Cheese Group, Inc. v. V&V Supremo Foods, Inc.*, 537 F. Supp. 2d 994 (W.D. Wis. 2008). The court stated:

> In lawsuits filed under the Lanham Act, the doctrine of laches plays a more important role than it otherwise might because the Act does not contain a statute

2

> of limitations on trademark infringement claims. . . . Once relevant state limitations period has run, an allegedly infringing party is entitled to a presumption that the doctrine of laches applies. . . . To rebut the presumption, a party must offer evidence excusing its delay or demonstrating that the party claiming laches has not suffered prejudice.

*Id.* at 1000 (internal citations and quotations omitted). The Court should consider a three-year statute of limitations in light of the allegations at issue as outlined in Section I, *supra*. Prestwick has not offered evidence demonstrating why it did not bring suit at any point between 2002 and 2014 essentially other than: "Everyone's copying me." See generally PFF 8-10 and 13-33. Finally, Prestwick has not offered evidence demonstrating Landmark's lack of prejudice.

### A. There is Insufficient Evidence to Show Progressive Encroachment on the Part of Landmark.

Plaintiff focuses its progressive encroachment argument on a First Circuit laches opinion. *See generally, Oriental Fin. Grp., Inc. v. Cooperative de Ahorro y Credito Oriental*, 698 F.2d 9, 20-24 (1st Cir. 2012). That circuit takes the same position as the Seventh with a two prong laches analysis, first focusing on the lack of diligence of the plaintiff, but adding that "laches applies only where the plaintiff knew or should have known of the infringing conduct." *Id.* at 21 (citations omitted); *see also*, *Bennett*, 827 F.2d at 69 (stating that a court must look at the "surrounding circumstances" to determine unreasonable delay). Prestwick shows that it has been continually aware of what it alleges to be infringement since 2002.

Progressive encroachment requires "proof that (1) during the period of the delay the plaintiff could not reasonably conclude that it should not bring suit to challenge the allegedly infringing activity; (2) the defendant materially altered its infringing activities; and (3) suit was not unreasonably delayed after the alteration in infringing activity." *Oriental*, 698 F.2d at 21-22.

Prestwick attempts to simplify a distinct fact pattern that allowed a finding of progressive encroachment. *See* Pl. Br. in Opp. at 10. *Oriental* involved competing financial institutions in

3

Puerto Rico. *Oriental*, 698 F.2d at 13. Plaintiff began using its mark in 1964. *Id.* Defendant used a similar mark in 1964, but had a geographically distinct and limited operation. *Id.* In 1996, plaintiff had 16 branches throughout Puerto Rico while defendant had three. *Id.* In 2008, defendant began an expansive advertising campaign and expanded geographically, and saw the defendant change its mark to more closely resemble that of the plaintiff. *Id.* In 2009, the plaintiff sent the defendant a cease and desist letter. *Id.* Suit was filed one year later. *Id.*

Prestwick fails to explain the court's holding. It looked to the first prong as the main dispute and indicated a plaintiff should have latitude in the timing of bringing suit and a plaintiff "need not sue in the face of *de minimis* infringement by the junior user." *Id.* at 23 (internal citations and quotations omitted). The second looked to whether the defendant redirected business to more squarely compete and increase public confusion—finding it "materially altered the reach of both its operations and allegedly infringing advertising" from 2008 to 2010. *Id.* at 22. Under the third, the court stated: "The complaint was filed . . . just after Cooperative began redirecting its operations and advertising efforts in 2008 and 2009, respectively. There is not even a contention that Oriental unreasonably delayed in bringing suit after Cooperative began its corporate expansion and increased its advertising activities." *Id.* at 23. The court found progressive encroachment "[g]iven the national scope of [the plaintiff's] business, the limited geographic scope of [the defendant's] business, and the limited scope of the allegedly infringing uses . . . the allegedly infringing activity was de minimis before 2009 . . . ." *Id.*

This dispute is distinguishable. Prestwick argues that the competition related to recycled plastic furnishings only started in 2011 or 2012 when Landmark decided to wholesale copy its product lines. *See* Pl. Resp. Br. at 10. Unlike *Oriental*, where the plaintiff moved immediately, Prestwick waited more than a decade before determining it was "right" to file suit.

4

Both Landmark and Prestwick grew their markets and product lines from 2002 to 2014. In addition to Prestwick's assertion of a trade dress in "some combinations" of elements, its claim that 2011 was the date where Landmark "materially altered" its business plan to move in different markets to more squarely compete with Prestwick is false. See PFF 8-10, 13-33.

### 1. Prestwick should have filed suit over the last 13 years.

In 2002, Prestwick (formerly known as Great Lakes) sent a cease and desist letter to Landmark stating "Landmark has recently implemented an unlawful plan to engage in unfair competition with Great Lakes." PFF 14-18. That letter laid out Prestwick's was concern with "'knock-offs' of many Great Lakes products including, Great Lakes' log tee markers, bag stands and fairway signs." *Id*. As a sophisticated entity, with rcounsel, its failure to act was a conscious decision to not bring suit at that time or reference the furnishings Landmark was already making.

While the cease and desist letter reflects the animosity of early competition the letter had no reference to recycled plastic enclosures, elements of claimed trade dress, copyright, or any other furnishings other than markers, stands, and signs. *Id.* Landmark had no proper notice of claims of infringement related to any type of specific asserted trade dress despite Prestwick's claim that it has been copied by Landmark and other companies since the early 2000s. *Id.*

Landmark continued to grow its business in golf and other markets for more than a decade without comment from Prestwick. Prestwick should have brought suit according to its own timeline in 2002, 2008, or 2011; it was unreasonable to wait 13 years.

### 2. Landmark did not materially alter its alleged infringing activities.

Landmark was already in the enclosure and furnishing marketplace in 2002. Landmark had enclosures and other products that contained elements of Prestwick's alleged trade dress as

early as 2003. RGB Decl., Ex. G. As its share of the golf market grew, the economy started to decline and Landmark realized it had to expand into other markets to maintain viability. *Id.*

Mr. Hlava testified that as Landmark identifies new potential markets, it cannot just enter the market because "you may be trying to sell, but you have yet to sell." *Id.* Even while expanding into different markets, Landmark and other companies in the enclosure market were making similar products manufactured out of wood, steel, and different types of materials that had the general look Prestwick claims to be its own. *Id.* Landmark only made the logical moves any business would take evolve products and develop markets since 2002 to stay viable in a changing economy and provide customers what they are looking for.

### 3. Suit was unreasonably delayed because Landmark did not alter its activity other than expanding its business, product options, and markets.

Prestwick is trying to have the best of both worlds. They assert that Landmark materially altered its alleged infringement anywhere from 2002 to 2011, but waited until 2014 to file suit. Prestwick's principal testified, "No, it's just terrible that we have to do this. I don't like doing these things, you know, but I've learned over the years I'm getting up there in age now, that you have to do that, and it's too bad that you can't be honorable businessmen." *Id.*, Ex. A. See also PFOF 8-10 and 13-33. Over the years, Prestwick has made few attempts to protect its designs, and has foregone its opportunity to do so by waiting for nearly 15 years to bring suit. *Id.*, Ex. A.

### B. Landmark continues to suffer prejudice due to Prestwick's delay in bringing suit.

"[U]nwarranted delay is not enough to foreclose relief, but there must be prejudice—reliance, to one's detriment, on a belief that delay signaled approval of the acts in question." *Blue Cross & Blue Shield Ass'n v. Am. Ex. Co.*, 467 F.2d 634, 640 (7th Cir. 2006). Landmark's reliance on Prestwick's lack of concern related to Landmark's expansion of furnishings in golf

6

and other markets has allowed Landmark to greatly expand its business. RGB Decl., Ex. G. Landmark purchased new equipment, increased to approximately 22 employees, spent more money on advertising, and risked expanding into markets it might not otherwise have had it not found success with its products over the last 13 years. *Id.* It was in competition with Prestwick and others for years. Landmark should not have to withdraw from the market because Prestwick failed to act on its concerns for more than a decade.

### C. Prestwick Fails to Show Sufficient Infringement of its Products to Be Entitled to Injunctive Relief or Damages Following the Filing of this Suit.

The Court should conclude that laches applies and that Prestwick's trade dress claim fails in its entirety. Prestwick has not shown any deliberate infringement that constitutes the "exceptional circumstances" it cites to in *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 615 (7th Cir. 1965).

If the Court accepts the three-year statute of limitations, this matter should be dismissed outright and there are no damages or profits to accrue since the date of filing and no injunction that could be instituted. Although "[t]rademark infringement is a continuous wrong," Prestwick has not shown any particular furnishing that infringes on its trade dress. *See James Burrough Ltd. V. Sign of Beefeater, Inc.*, 572 F.2d 574, 578 (7th Cir. 1978). If a finding of infringement were to be made, any damages should be those accrued after the filing of this action.

### III. PRESTWICK'S PRODUCTS DO NOT POSSESS PROTECTABLE TRADE DRESS.

Prestwick provides no comprehensible breakdown of what elements actually constitute its trade dress. In its response brief Prestwick repeatedly states its trade dress is a "combination of *some* of the following elements," Pl. Br. at 25, but provides no clue as to just what type of combinations could be protected. Trade dress refers to the total image of a product, including

7

size, shape, color combinations, graphics, packaging and label. *See, e.g.*, *Computer Care v. Service Systems Enters., Inc.*, 982 F.2d 1063, 1067 (7th Cir. 1992); *NutraSweet Co. v. Stadt Corp.*, 917 F.2d 1024, 1027 n.1 (7th Cir. 1990), *Roulo v. Russ Berrie Co., Inc.*, 886 F.2d 931, 935 (7th Cir. 1989). Prestwick's description of its total image is merely an attempt to force its competitors out of its way by hoarding variations of decorative elements.

Just as a home builder would not be prevented from using straight walls squared at the corners, colored siding with white trim, and gables to accentuate its structure because another builder in the region has built similar homes, Landmark should not be prevented from using full-frame construction that incorporates colors, square posts, an arch, or grooves. Similarly, the "available" other designs Prestwick argues Landmark and its other competitors can use would be like asking phone manufactures that compete with Apple to step back and sell non-touch screen phones. Prestwick, Landmark, and other competitors in the marketplace create furnishings that are meant to look handmade and fit the "feel" of the area where they are displayed.

### A. Prestwick's Trade Dress is Functional.

Prestwick points out that functionality is assessed by analyzing the trade dress as a whole. Pl. Br. in Opp. at 19. However, it does not provide a comprehensible breakdown of what elements actually constitute its trade dress. A "combination of *some* of the following elements," Pl. Br. at 25, provides Prestwick an "overall look and feel" its furnishings that cannot be defined.

Prestwick glosses over the fact that it makes cabinets and all cabinets from all sources have similarities. PFF 91. Because of the breadth of the combinations of Prestwick's claimed trade dress, Landmark and other competitors would be foreclosed from using certain elements solely because they might infringe on what Prestwick asserts to be its "look and feel." Competitors should not have to tip toe through the design of new furnishings, constantly asking:

8

Does this post and panel combination with that color infringe? Is that decorative arch infringing? Prestwick's "pick and choose" trade dress is functional; it removes its competitors' ability to compete by removing five common elements without a definitive indication of how they could be properly used as is required to examine all of the trade dress elements collectively. *Vaughan Mfg. Co. v. Brikam Int'l, Inc.*, 814 F.2d 346, 350 (7th Cir. 1987).

Landmark's enclosures utilize full-frame construction as opposed to Prestwick's post and panel construction. PFF 81-82. This is not an insignificant difference. Post and panel construction is a way to make a sign, not a strong cabinet. That is the reason that Landmark's enclosures are a higher quality and do not bow out as Prestwick's product did at Loyola Marymount University ("LMU"). Dan Hlava testified that using varying types of plastics for different colors or using vertical grooves could also affect the cost and quality of the enclosures it makes depending on what a customer requested. See Response to Prestwick PFF 42. Landmark's use of full frame construction includes various elements as part of the whole piece instead of mere decorative portions. PFF 81-82. Bill Stonecypher was impressed with the superior construction differences that Landmark incorporated into its products for the school. Id.

### 1. The claimed combinations of "some" elements affects the cost and quality of what Landmark and others can build.

Prestwick implies that it should have control over the entire market of square furnishings. Pl. Br. in Opp. at 21. Forcing Landmark and other competitors to refrain from using traditional joinery techniques would require new tools and more drastic and non-traditional decorative elements. PFF 94. Prestwick admitted that the reason they started using post and panel construction was because Matt Morse sat down with Dave Vanderbrook, "a friend who was a woodworker and knew a little bit about joinery . . . ." Prestwick PFF 10. "[W]as just helping us figure out a way to assemble the post and panels, you know."

9

Prestwick cites Mr. Patla to indicate that none of the elements affect the cost and quality of Landmark's products, but failed to cite Mr. Hlava's contrasting testimony. Prestwick PFF 42.

### 2. Landmark's inability to continue producing its own products puts it at a significant non-reputational disadvantage.

Prestwick's amorphous "some combination" of elements claim of alleged trade dress allows Prestwick to try and remove a significant portion of Landmark's existing product lines from the competitive market and would essentially force it to create new designs and lines for a significant portion of its business. Landmark is providing what customers want and competing with an individual whose own business motto is: "And so we go in, we try to be relevant, and then we try to dominate." *Id.*, Ex. A. See Prestwick PFF 5. Prestwick is trying to prevent Landmark and other competitors from creating product that allows them to compete.

### 3. Material facts are not in dispute.

Prestwick claims an exclusive right to various traditional decorative elements in the building of its enclosures. It cannot provide a clear depiction of its asserted trade dress and that fails to be functional under the law. *See Vaughan*, 814 F.2d at 350. Landmark and other competitors in the market cannot be handcuffed by the unclear "some combination" of elements Prestwick claims to have over the market place; therefore there are no material facts in dispute.

### B. Prestwick's Trade Dress has not Acquired Secondary Meaning.

To show secondary meaning has been achieved, Prestwick must prove what portions or combination of its alleged trade dress are identified by consumers. *See Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 661 (7th Cir. 1995). It cannot. It cannot readily define what the purported trade dress is without resorting to mixing and matching. There is no evidence that consumer commentary has anything to do with the elements of the asserted trade dress. The

10

remainder of its financial arguments cannot pinpoint what aspects of their mix and match approach to trade dress are responsible for their sales.

### 1. Prestwick's direct consumer testimony is solicited and self-serving.

None of the testimonials Prestwick provides indicate that the reason they provide their feedback is due to the asserted trade dress at issue in this matter. *See* Pl. Br. in Opp. at 28-30. Further, at least one testimonial indicates that the product at issue was designed by the customer, not Prestwick. See Response to Prestwick PFF 81. Additionally, Prestwick admits to sending free product to various potential customers in the hopes the customer would be forced to purchase exact copies to facilitate coherent enclosures throughout a particular facility. RGB Decl., Ex. A.

### 2. Prestwick's expert provides no description of what "combination of some" elements of the alleged trade dress acquired secondary meaning.

Dr. Chiagouris makes no relevant connection to *what* combinations of "some" of the alleged elements are at issue and are the focus of his analysis. He provides broad generalizations about Prestwick's growth and familiarity with it as a brand, but no specifics. Those generalities without a consumer survey—which could easily show how well known Prestwick's trade dress is—weigh heavily against secondary meaning.

### 3. Prestwick's alleged trade dress has been used by multiple companies in multiple markets since 2003.

Prestwick's assertion that it has used certain elements of its alleged trade dress since 1999 merely bolsters the laches defense argued above in section II, *supra*. Additionally, multiple companies have used these same elements in various combinations since the early 2000s. See Response to Prestwick PFF 17.

11

### 4. Prestwick's advertising merely shows it is a larger company than its competitors.

Prestwick is the largest player in the market, much larger than Landmark. "[W]e've probably hired . . . 500 different people over 17 years. We have about 100 people now . . . ." *Id.*, Ex. A. Landmark employs 22 people. As a company grows and expands to new markets its advertising and marketing costs will increase. Prestwick's Response shows that is true for Landmark, as its advertising grew from 2011 to 2014. Pl. Br. in Opp. at 33. Prestwick cannot show what elements were used to advertise and tries to foreclose any competition.

### 5. Prestwick's sales merely show that it has expanded its position in various marketplaces.

Nothing about its sales show that Prestwick has achieved secondary meaning. Prestwick provides no information about what combinations of elements or how many constitute the asserted trade dress. There is no answer to: what exactly is "some of the elements?" *See* Pl. Br. in Opp. at 34-35. All this shows is that Prestwick's business continues to improve and they continue to rake in substantial revenue.

### 6. Prestwick copied established traditional cabinetry and associated elements to design what it alleges to be a trade dress.

The names of some of Prestwick's lines show that they have merely copied traditional designs from history or the "look and feel" certain areas. Matt Morse testified that Prestwick has product lines called "Heritage," "Classic," and "Tuscany." RGB Decl., Ex. A. Each of these lines uses a portion of the claimed trade dress, but merely mimics traditional building techniques and the design of a finished product that have existed for centuries.

This is shown by Prestwick's work with the outside contractor Bravura and their in house designer, Chris Brown. This company and Prestwick's designer provided already existing panel

designs that mimicked normal construction and Matt Morse narrowed his choice to four or five of them.  *Id.*, Ex. H.

### 7. Prestwick has no evidence of intentional copying instigated by a former client.

Bill Stonecypher testified that LMU dictated the design of the product to Max-R in detail and that the rendering prepared by Max-R included specific design elements that LMU requested, including the colors, logo, arch and vertical lines in the panel.  PFF 67.  LMU owns the design as they dictated the specifications to the vendor, as they do with many products.  Id. LMU is very proprietary with its aesthetics, looks and standards and this product was heavily vetted by LMU.  Id.  LMU routinely has their products made by a number of manufacturers, but like the waste and recycling stations at issue here, LMU designs the products to their specifications.  Id.  Indeed, Stonecypher was not familiar with the Max-R product lines, including the Halston.  LMU makes specification bid packages where they dictate what they want.  LMU has its own ideas.  Id

Bill Stonecypher did not ask Chad Schaefer of Landmark to build a product that looked the same.  He asked if Schaefer could match the aesthetics of the LMU product, because that was the campus standard.  PFF 69.  Stonecypher provided Landmark and Prestwick with a .pdf document that contained the LMU color and logo requirements.  Stonecypher's goal was for the Landmark product to match the LMU standards as stated in the logo requirements.  Id.

Stonecypher requested that Landmark add vertical lines to the product because LMU was trying to maintain the look of the product it had dictated to Prestwick.  Id.

### C. Landmark's Products are Not Confusingly Similar.

Prestwick relies on an email asking about Landmark that makes no reference to product type, trade dress, or any possible reason for potential confusion.  It also cannot rest on an

13

assertion that there was intentional copying for the reasons stated in section III.B.7, *supra* and section IV, *infra*. Prestwick, Landmark, and multiple other companies have offered similar products in various marketplaces for years and only one customer has relayed some type of confusion to Prestwick. That is not enough to survive summary judgment.

**IV.     Landmark Did Not Infringe Prestwick's Copyright in the Rendering of the LMU-Badged Verde Series Enclosure.**

See Secton III.B.7, supra for a discussion of the evidence that Landmark did not infringe Prestwick's copyright. Landmark did not copy Prestwick's rendering. Landmark was provided a rendering by LMU with no indication of ownership or designation of its creator. Landmark then created its own rendering and offered that design to LMU for consideration. Following an exchange with LMU, Landmark was then instructed to change the rendering to mirror the waste enclosures LMU already had on its campus so the school would not differences in designs.

In *Building Graphics, Inc. v. Lennar Corp.*, 708 F.3d 573 (4th Cir. 2013), plaintiff failed to establish a reasonable possibility that defendant home builder had access to the plaintiff's copyrighted home designs, as would support a copyright infringement claim, even though the defendant conducted due diligence analysis on other homes in the market, plaintiff's plans were available on the internet, where the firm delivered hard copy blueprints of the home plan it owned to its firm and instructed it to base its new home plans on that plan. Only a small number of homes in the market were built from the copyrighted plans, and the plans were no longer used to build in the market, and there was no evidence of copyrighted plans being prominently featured on firm's website in such way that builder would easily find them. *See generally, id.*

As in *Building Graphics*, Landmark complied with its client's request and was instructed to make subtle differences. At best, Prestwick has established elements of "innocent infringement". *See* 17 U.S.C. § 504(c)(2). If an alleged infringer can show copying of protected

14

material is so trivial that it falls below the quantitative threshold of substantial similarity, that *de minimis* infringement is not actionable. *Louisiana Contractors Licensing Service, Inc. v. American Contractors Exam Services, Inc.*, 13 F. Supp. 3d 547 (M.D. La. 2014).

## V. Landmark Requests that Prestwick Be Estopped from Arguing Any Federal or State Issues of Unfair Competition.

Based on Prestwick's statement in its Response that it "is not asserting a separate claim for unfair competition distinct from its trade dress infringement claim," Pl. Br. in Opp. at 40, Landmark respectfully requests the Court estop Prestwick from making any future argument regarding unfair competition.

## CONCLUSION

Based on the foregoing as well as its original memorandum and motion, Landmark Studio, Ltd. respectfully requests its Motion for Summary Judgment be granted, dismissing the Plaintiff's claims in their entirety, with prejudice, on the merits, and with costs.

Dated this 24th day of April, 2015.

CRIVELLO CARLSON, S.C.
Attorneys for Defendant Landmark Studio, Ltd.

By: /s/Ryan G. Braithwaite
    PATRICK W. BRENNAN
    State Bar No. 1014688
    RYAN G. BRAITHWAITE
    State Bar No. 1037232
    WILLIAM E. KEELER, III
    State Bar No. 1059791

Post Office Address:
710 N. Plankinton Avenue
Milwaukee, WI 53203
Phone: 414-271-7722
Fax: 414-271-4438
pbrennan@crivellocarlson.com
rbraithwaite@crivellocarlson.com
wkeeler@crivellocarlson.com